IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | NO.   4:18-CR-00230-O |
| DENISE CROS-TOURE (01)<br>MOHAMED TOURE (02) | |

**<u>TRIAL BRIEF OF THE UNITED STATES</u>**

Respectfully submitted,

_____
REBEKAH J. BAILEY
Trial Attorney
U.S. Department of Justice, Civil Rights Division
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530
State Bar of Texas, Bar Card No. 24079833

_____
WILLIAM E. NOLAN
Trial Attorney
U.S. Department of Justice, Civil Rights Division
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530
State Bar of Maryland, Bar Card No. 0012130143

_____
ALEX C. LEWIS
Assistant United States Attorney
Missouri State Bar No. 47910
801 Cherry Street, Suite 1700
Fort Worth, Texas 76102
Telephone:  817-252-5200

Table of Contents

I.  PROCEDURAL BACKGROUND ........................................................................... 1

II.  SUMMARY OF ANTICIPATED EVIDENCE ..................................................... 2

III.  SUMMARY AND ANALYSIS OF APPLICABLE LAW ................................... 9

   A.  Counts One and Two: Conspiracy to Commit Forced Labor and Forced Labor ............ 9

      1.  Count One – Conspiracy to Commit Forced Labor, 18 U.S.C. 1594(b) and 1589 ...... 9

      2.  Count Two – Forced Labor 18 U.S.C. § 1589, 1594(a) and 2 .................................. 11

   B.  Counts Three and Four – Conspiracy to Harbor an Alien for Financial Gain and
   Harboring an Alien for Financial Gain,  8 U.S.C. §§ 1324(a)(1)(A)(v)(I), 1324(a)(1)(A)(iii), and
   1324(a)(1)(B)(i) ........................................................................................................... 19

      1.  Count Three – Conspiracy to Harbor an Alien for Financial Gain, 8 U.S.C.
      §§ 1324(a)(1)(A)(v)(I) and 1324(a)(1)(B)(i) ........................................................ 19

      2.  Count Four—Harboring an Alien for Financial Gain, 8 U.S.C. §§ 1324(a)(1)(A)(iii),
      1324(a)(1)(A)(v)(II), and 1324(a)(1)(B)(i) ......................................................... 19

   C.  Count Five – False Statement, 18 U.S.C. § 1001(a)(2)) ............................................... 22

   D.  *Bruton* Issue ............................................................................................................... 23

IV.  CONCLUSION ...................................................................................................... 24

**Table of Authorities**

## Cases

*Bruton v. United States*, 391 U.S. 123 (1968) ........................................................... 23

*De Jesus-Batres*, 410 F.3d 154, 161 (5th Cir. 2005 .................................................... 21

*Richardson v. Marsh*, 481 U.S. 200 (1987) ................................................................ 23

*Smith v. United States*, 508 U.S. 223, 228 (1993) ...................................................... 11

*United States v. Aggrawal*, 17 F.3d 737, 744 (5th Cir. 1994) .................................... 18

*United States v. Alzanki,* 54 F.3d 994, 1000-01 (1st Cir. 1995) ................................. 14

*United States v. Alzanki*, 54 F.3d 994, 999, 1004-05 (1st Cir. 1995) ......................... 17

*United States v. Bibbs*, 564 F.2d 1165, 1168 (5th Cir. 1977) ..................................... 17

*United States v. Bieganowski*, 313 F3d. 264, 277 (5th Cir. 2002) .............................. 10

*United States v. Booker*, 655 F.2d 562, 566 (4th Cir. 1981) ....................................... 17

*United States v. Bradley*, 390 F.3d 145, 150 (1st Cir. 2004) ...................................... 13

*United States v. Calimlim*, 538 F.3d 706, 712 (7th Cir. 2008) ................................... 13

*United States v. Campbell*, 770 F.3d 556, 570 (7th Cir. 2014) ................................... 21

*United States v. Ceballos*, 789 F.3d 607, 613 (5th Cir. 2015) .................................... 24

*United States v. Dann*, 652 F.3d 1160, 1172 (9th Cir. 2011) ..................................... 16

*United States v. Dixon*, 132 F.3d 192, 200 (5th Cir. 1997) ........................................ 21

*United States v. Djoumessi*, 538 F.3d 547, 552-53 (6th Cir. 2008) ............................ 15

United States v. Esparza, 882 F.2d 143, 145-146(5th Cir. 1989) ................................ 20

*United States v. Farrell*, 563 F.3d 364, 373 (8th Cir. 2009) ....................................... 16

*United States v. Freeman*, 434 F.3d 369, 376, n.5 (5th Cir. 2005) ............................. 10

*United States v. Garcia Abrego*, 141 F.3d 142, 167 (5th Cir. 1998) .......................... 10

**Table of Authorities**

*United States v. Garcia*, 2003 WL 22956917, at *4 (W.D.N.Y. 2003) ........................................ 12

*United States v. Garcia,* 883 F.3d 570 (5th Cir. 2018) ................................................................ 22

*United States v. Gaudin*, 515 U.S. 506, 509 (1995) ..................................................................... 23

*United States v. Harris*, 701 F.2d 1095, 1100 (4th Cir. 1983) ..................................................... 17

*United States v. Hoover,* 467 F.3d 496, 499 (5th Cir. 2006) ........................................................ 23

*United States v. Jara-Favela*, 686 F.3d 289, 301 (5th Cir. 2012) ................................................. 23

*United States v. Jimenez-Elvierz*, 862 F.3d 527, 533-34 (5th Cir. 2017) ...................................... 20

*United States v. Kozminski,* 487 U.S. 931, 951-52 (1988) ........................................................... 14

*United States v. Li*, 615 F.3d 752, 756 (7th Cir. 2010) ................................................................ 22

*United States v. Morales–Rosales,* 838 F.2d 1359, 1361 (5th Cir.1988) ..................................... 20

*United States v. Najera Jimenez*, 593 F.3d 391, 399 (5th Cir. 2010) ........................................... 23

*United States v. Nnaji*, 447 F. App'x 558, 560 (5th Cir. 2011) ................................................... 16

*United States v. Nnaji*, No.4:09-CR-172-A (N.D. Tex. Feb. 2, 2010) (Dkt No. 84) .................... 10

*United States v. Reveles*, 190 F.3d 678, 683 (5th Cir. 1999) ........................................................ 24

*United States v. Rubio-Gonzalez*, 674 F.2d 1067, 1073 (5th Cir. 1982) ....................................... 21

*United States v. Shabani*, 513 U.S. 10, 13 (1994) ....................................................................... 10

*United States v. Shum*, 496 F.3d 390, 392 (5th Cir. 2007) ........................................................... 21

*United States v. Sung Bum Chang*, 237 F. App'x 985, 988 (5th Cir. 2007) ........................... 15

*United States v. Tavarez-Levario*, 788 F.3d 433, 439 (5th Cir. 2015) .......................................... 11

*United States v. Turner*, 674 F.3d 420 (5th Cir. 2012) ................................................................ 19

*United States v. Vargas-Cordon*, 733 F.3d 366, 382 (2d Cir. 2013) ............................................ 20

*United States v. Vargas-Ocampo*, 747 F.3d 299 (5th Cir. 2014) .................................................. 24

*United States v. Veerapol*, 312 F.3d 1128, 1132 (9th Cir. 2002) .................................................. 16

*United States v. Warren,* 772 F.2d 827, 834 (11th Cir. 1985) ...................................................... 18

*United States v. Williams*, 449 F.3d 635, 646-48 (5th Cir. 2006) ................................................. 22

*United States v. Zheng,* 306 F.3d 1080, 1085 (11th Cir. 2002) .................................................... 22

**Statutes**

18 U.S.C. § 1001 ............................................................................................................................ 1

18 U.S.C. § 1584 .......................................................................................................................... 14

18 U.S.C. § 1589 ............................................................................................................................ 1

18 U.S.C. § 1594 ............................................................................................................................ 1

18 U.S.C. § 2 ................................................................................................................................ 18

22 U.S.C. § 7101 .......................................................................................................................... 12

8 U.S.C. § 1324 .............................................................................................................................. 1

**Other Authorities**

Fifth Circuit Criminal Pattern Jury Instructions No. 2.15A (2015) .............................................. 10

Fifth Circuit Pattern Jury Instructions No. 1.37 (2015) ............................................................... 18

Fifth Circuit Pattern Jury Instructions Nos. 245 (2015) .............................................................. 23

H.R. Conf. Rep. No. 106-939 ....................................................................................................... 13

*Merriam-Webster's Collegiate Dictionary* (11th ed. 2014) ........................................................ 12

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA

v.                                              NO.    4:18-CR-00230-O

DENISE CROS-TOURE (01)
MOHAMED TOURE (02)

**TRIAL BRIEF OF THE UNITED STATES**

The United States of America, by and through undersigned counsel, submits this

Trial Brief to the Court in preparation for trial commencing January 4, 2019.  In this Brief,

the government summarizes the salient aspects of evidence to be introduced at trial, and

sets forth the legal principles governing the offenses charged in Counts One through Five

of the Indictment.

## I.        PROCEDURAL BACKGROUND

On September 19, 2018, a grand jury indicted the defendants, charging them both with

four counts: 1) Count One charges conspiracy to commit forced labor in violation of 18 U.S.C.

§ 1594(b); 2) Count Two charges forced labor in violation of 18 U.S.C. § 1589; 3) Count Three

charges conspiracy to commit alien harboring in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I);

and 4) Count Four charges alien harboring for financial gain in violation of 8 U.S.C. §

1324(a)(1)(A)(iii) and 1324(a)(1)(B)(i).  The grand jury additionally charged defendant

Mohamed Toure in Count Five with making false statements in violation of 18 U.S.C. § 1001.

The charges stem from the defendants' nearly sixteen-year criminal scheme to coerce the labor

1

of victim D.D., who was a minor for some of the time, and to harbor and conceal her in their house in Southlake, Texas.

## II.    SUMMARY OF ANTICIPATED EVIDENCE

The government expects to present evidence at trial that will establish that D.D. was born in a village in rural Guinea where she received a limited education, but remained illiterate. In approximately 1998, defendant Cros-Toure's parents arranged for D.D., who was a minor, to work for them in their house as a domestic servant in Conakry, the capital of Guinea. While she was there, she performed housekeeping tasks such as cooking and cleaning alongside two other young girls. D.D. did not attend school while residing with the Cros family in Conakry, nor was she paid

In 2000, the defendants arranged for D.D. to come to the United States and work for them as a domestic servant. The evidence will show that D.D., while still a minor, traveled alone to the United States where she was met by defendant Toure, who transported her to the defendants' house in Southlake. D.D. entered the United States on B-2 temporary travel (or "tourist") visa. Her visa was never renewed by the defendants, nor did they help her obtain any legal status while in the United States.

The evidence will establish that from the moment of D.D.'s arrival in 2000 through her eventual escape in 2016, D.D. worked extensive hours providing childcare and performing other domestic services for the defendants. D.D. would prepare breakfast for the defendants' children, and after they left for school, she would clean, make the beds, vacuum, cook, paint, garden, and do yard work with the lawnmower, edger, shears, and rake. Witnesses will corroborate D.D.'s testimony about the work defendants required her to perform. Although she cooked the majority

of the meals in the defendants' home, the defendants did not allow D.D. to sit and eat with the family unless specifically invited to do so.

The evidence will show that throughout the Indictment period, the defendants physically and verbally abused D.D. when they were displeased with her work in the home.  For example, during one assault, defendant Cros-Toure took D.D. to the master bathroom and started hitting her after she found D.D. drawing instead of cleaning.  On another occasion, defendant Cros-Toure ripped D.D.'s earring from her pierced left ear tearing her ear lobe, after D.D. began a task that she was supposed to have already completed.  On one occasion, defendant Toure struck D.D. and twisted her arm.  On another occasion, when D.D. was trying to get away from defendant Cros-Toure, defendant Toure forced D.D. to the ground by sitting on her back, which enabled defendant Cros-Toure to strike her buttocks repeatedly with a belt.  Sometimes, defendant Cros-Toure used an electrical cord to strike D.D. as punishment.  During the assaults, D.D. would raise her arms in defense to protect her face, causing injury and scarring to her arms.  Photos of D.D.'s ear and of the scars on her arms corroborate her testimony.

Additionally, defendant Cros-Toure would routinely kick D.D. out of the house and off of their property as punishment.  Testimony will establish that when defendant Cros-Toure told D.D. to leave the property, D.D. would go to the park next to the defendants' neighborhood.  In April 2002, a Southlake Police Department Officer saw D.D. in the park by herself and brought her back to the defendants' house.  He will testify about seeing D.D. wearing "dirty unkept clothes" and being "very visibly scared and nervous."  The officer will testify that defendant Toure was evasive when asked questions about why D.D. was at the park.  He will also testify to other details the defendants told him about D.D.'s life with them which other evidence will show was false.

Although she was relatively close in age to the defendants' oldest children, evidence will establish that the defendants did not treat D.D. like their children. For instance, testimony will establish that for the first 11 years she was in the defendants' house, the defendants made D.D. sleep on the floor in one of their children's bedrooms. For the last five years, D.D. slept on a mattress on the floor in one of the children's room, but D.D. did not have a bed frame or a comforter as the defendants' children did. Similarly, while D.D. was allowed to use the same bathroom as the defendants' children, the defendants did not allow D.D. to use the same hygiene products or towels as their children. A witness will confirm that D.D. had a toiletry "caddie," which she kept by her bed, but the defendants' daughters had many beauty products in the bathroom. In the early years covered by the Indictment, when D.D. was young, defendant Cros-Toure instructed defendant Toure to buzzcut D.D.'s hair with electric clippers as punishment. Photographs and testimony will corroborate D.D.'s hair being closely cut to her head.

Additionally, the defendants denied D.D. involvement in normal childhood activities, further isolating her from the defendants' children and society. The defendants allowed their children to partake in a variety of childhood and adolescent activities, including taking swimming lessons, playing sports, having play dates and sleep-overs, possessing cell phones, attending drivers' education and eventually obtaining drivers' licenses. On the other hand, the defendants did not regularly allow D.D. participate in any of those activities. The defendants celebrated their children's birthdays with parties, but did not even know or acknowledge D.D.'s birthday.

In the entirety of the 16 years D.D. worked for the defendants, they never took her to the doctor, with one exception noted below. By comparison, the defendants' children visited doctors regularly, as corroborated by medical records obtained by the Government. The defendants also visited the dentist, and some of the children had orthodontic work done. However, the defendants

did not take D.D. to the dentist for routine visits, even after she fell and cracked her front tooth, which eventually fell out.

At some point in 2014, D.D. woke up with a very swollen face caused by an abscessed tooth. A witness helped by taking D.D. to a family friend who was a doctor to get a shot. Later, defendant Toure drove D.D. to a Dallas dental school where he paid cash to have her tooth extracted. Records confirm that the procedure occurred in July 2014. According to D.D., defendant Toure filled out the paperwork required by the clinic to complete the procedure, providing a date of birth that is different than the one provided on her passport.

The evidence will establish that the defendants isolated D.D. and prevented her from developing any independence. The most obvious fact of her isolation was that the defendants did not allow D.D. to attend school thereby depriving her of an education and of a social network. Records obtained from the local school district demonstrate that all five of the defendants' children were enrolled in school. Despite the fact that D.D. was school age for at least part of the Indictment period, the school district did not have any records showing D.D. was enrolled in school. During his post-arrest interview, defendant Toure confirmed that he and his wife did not allow D.D. to attend school or formally learn English, compared to their children. Defendant Toure claimed that they did not send her to school because she was not legally in the United States. In addition to not enrolling D.D. in school, testimony will establish that the defendants did not help D.D. learn to read at home. A witness will testify she noticed D.D. was not attending school and spoke to defendant Cros-Toure about it, but defendant Cros-Toure prevented the witness' efforts to enroll D.D. into an alternative school. Despite her lack of formal education, D.D. can understand and speak English and French. She can read and write in basic English.

Evidence will establish that in 2003, the defendants and their children travelled to France and sent D.D. to live with some friends.  During her stay with the defendants' friends, D.D. told the mother of the family details about her mistreatment by the defendants.  When they returned, the mother told the defendants what D.D. said to her and the defendants subsequently punished D.D.  This incident further isolated D.D., making her believe that she had no recourse for her mistreatment.

The evidence will establish that the defendants' prevented D.D. from freely communicating with her family.  D.D. was only able to talk with her family in Guinea on about ten occasions over sixteen years.  D.D. will testify that the calls were less than ten minutes and always monitored by a member of the defendants' family, so the most she could say was "fine" when her parents asked her how she was doing.  Testimony from D.D.'s mother will corroborate D.D.'s account.  For example, D.D.'s mother told Special Agents that the first time she spoke to D.D. on the phone, she could hear in D.D.'s voice that she was "upset and unhappy."  She asked defendant Cros-Toure to send D.D. home, and defendant Cros-Toure told her she would, but never did.

Testimony will establish that the defendants' constantly threatened to send D.D. back to Guinea.  To bolster the threats, Cros-Toure often mentioned that another girl who used to work for her and co-defendant Toure was sent back to Guinea in 2000.  During his post-arrest interview, Toure confirmed that a girl, who was not their child, lived with them before D.D. arrived.

As D.D. grew older, and specifically during the last few years prior to her escape, D.D. affirmatively told the defendants that she wanted to go back to Guinea.   On one occasion, Toure took D.D. to CVS to have her passport photos taken.  However, neither of the defendants assisted D.D. with updating her passport and visa.  In fact, Cros-Toure told D.D. that she would not "waste" money to send D.D. back.   In a recorded conversation discussed more below, Cros-Toure

responded to D.D.'s request to go back to Guinea by stating, "We will do what we can when we can. We are not getting you one cent in your ticket if I don't have it. That's one. I will get your passport, [when] I am ready – when I have the money to pay the people. That's the way it's going to work. You don't tell me anything."

As time progressed, D.D. became more unhappy in the defendants' home. D.D. will testify that she reached her tipping point in the summer of 2016. On Father's Day in 2016, the defendants and their children went to dinner to celebrate. The next day, defendant Cros-Toure became angry with D.D. for not preparing dinner and called defendant Toure to yell at D.D., which he did. Cros-Toure continued yelling and began hitting D.D. Once the hitting and yelling ended, D.D. left the defendants' house. She left with some clothes and her Kindle. After leaving the house, D.D. stayed the next two nights at the park and occasionally walked over to the neighborhood Starbucks, where she used the Wi-Fi and her Kindle to contact a former neighbor. The neighbor picked D.D. up and allowed D.D. to stay with her for a few days. The evidence will show that D.D. then called another former neighbor and asked to stay with her for a while. D.D. stayed with the witness for several nights and told her about her background and how the defendants treated her. The witness will testify that several things D.D. told her contradicted what defendant Cros-Toure had told her about D.D.'s life over the years. In particular, D.D. explained that she had never finished school, and did have a family back in Guinea. Defendant Cros-Toure had previously told this witness that D.D. had finished school in Guinea, and was living with the defendants because D.D.'s parents had died.

Eventually, D.D. decided to go back to the defendants' home. When the witness dropped D.D. off at the defendants' home, the witness confronted both defendants about D.D.'s disclosures. The witness will testify that the defendants denied hitting D.D., but did admit that her travel

document was long expired.  Defendant Toure told the witness that he was working on getting a valid document for D.D.

D.D. knew that Cros-Toure and Toure would be angry after the former neighbor confronted them.  After the neighbor left, D.D. switched on the recording function on a personal electronic device so that she could capture what the defendants said to her.  The recording is approximately 10 minutes in length.[1] Defendant Cros-Toure speaks the most, and is often screaming at D.D.; however, defendant Toure speaks some at the beginning and tells D.D. to "go" and asks her "who do you think you are?"  Cros-Toure is heard telling  D.D. that she "can go someplace else and work," and "we are not sending you back," and "you want to go sleep in the park?  You think somebody is going to go get you?  Watch.  Watch."  Finally, Cros-Toure told D.D., "Go live in the park.  If you get killed, I don't give a shit, I don't know you.  If you get raped, I don't care."

The evidence will establish that after this conversation, D.D. knew that she had to leave.  D.D. even asked the defendants to send her home.  She recorded a second conversation several days after she got back to the defendants' house which captures Cros-Toure telling her:

> "You are in my house until you get on the plane.  You need to be working in this house. . . . You came for that.  I'm going to put you on the plane, before you do that, my house needs to be cleaned.  You start.  You're not going anywhere."

Testimony will establish that in August 2016, D.D. reached out to a former family friend of the defendants for help.  Years prior to 2016 on the last occasion the friend was at the defendants' home, she will testify that she gave a business card with her phone number to D.D. and told D.D. to call her if she ever needed help.  When D.D. met with the witness, D.D. told her

---

[1] The recording has already been translated and transcribed by the State Department and was turned over to defense in discovery.

about the defendants abusing her and failing to pay her for her work.  The witness then contacted

other former neighbors, and they all agreed that D.D. had to leave.  The group of former

neighbors and former friends of the defendants helped come up with a plan to get D.D. out of the

defendants' home.

Testimony will show that on August 17, 2016, D.D. left the defendants house.  She

packed a few bags with her clothes, her expired passport and visa, and a few photos.  A witness

picked D.D. up in Southlake and eventually took her to Houston.

Upon his arrest on April 25, 2018, Toure provided a recorded post-arrest Mirandized

interview. During the interview, he made demonstrably false statements to the agents.  He

stressed multiple times that he attempted to adopt D.D, but could not do because his attorney,

James Showers, told him it was impossible.  This statement is material as it provides a self-

serving exculpatory and alternative explanation about why D.D. was illegally living in his home

for sixteen years.  The testimony of attorney James Showers will demonstrate that defendant

Toure did not speak to him about adopting D.D., and in fact, Showers' last communication with

defendant Toure was several years before D.D. arrived in the United States in 2000.

### III.    SUMMARY AND ANALYSIS OF APPLICABLE LAW

#### A.  Counts One and Two: Conspiracy to Commit Forced Labor and Forced Labor

##### 1.  Count One – Conspiracy to Commit Forced Labor, 18 U.S.C. 1594(b) and 1589

Count One of the Indictment charges each defendant with Conspiracy to commit Forced

Labor.  To find the defendants guilty of Conspiracy under Count One, the government must

prove these elements for each defendant:[2] 1) that the defendant and at least one other person made an agreement to commit the crime of forced labor; and 2) that the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with intent to further the unlawful purpose. Unlike conspiracies under Section 371, Section 1594 does not require proof of overt acts. *United States v. Shabani*, 513 U.S. 10, 13 (1994) (holding that overt act requirement should not be inferred where the statute itself does not require it).

Additionally, the government must prove that the conspiracy continued after December 23, 2008, the effective date of the forced labor conspiracy statute. Conspiracy is a continuing offense. *United States v. Garcia Abrego*, 141 F.3d 142, 167 (5th Cir. 1998) (holding that where "acts in a continuing offense occurred before effective date" of the relevant statute … the trial court must inform the jury of the effective date of the statute and instruct the jury that, in order to convict the defendant of the offense, it must find that the offense continued after the effective date of the statute."). While the indictment alleges that the agreement to commit the crime of forced labor began in 2000, the indictment also alleges—and the evidence will show—that the conspiracy continued after the forced labor conspiracy statute went into effect in 2008 and up until D.D. left the defendants' house in 2016.

To establish a conspiracy, the agreement need not be "explicit or formal," as a tacit agreement is sufficient. *United States v. Freeman*, 434 F.3d 369, 376, n.5 (5th Cir. 2005). The existence of the agreement may be established solely by circumstantial evidence and may be inferred from "concert of action." *United States v. Bieganowski*, 313 F3d. 264, 277 (5th Cir. 2002). Voluntary participation in the conspiracy "may be inferred from a collection of

---

[2] 18 U.S.C. 1589; Fifth Circuit Criminal Pattern Jury Instructions No. 2.15A (2015); Jury Instructions at 7-8, *United States v. Nnaji*, No.4:09-CR-172-A (N.D. Tex. Feb. 2, 2010) (Dkt No. 84).

circumstances," and knowledge of the conspiracy "may be inferred from surrounding circumstances." *Id*.

### 2.  Count Two – Forced Labor 18 U.S.C. § 1589, 1594(a) and 2

Count Two charges the defendants with a substantive violation of the forced labor statute for their conduct towards D.D.  Because the Indictment alleges that the defendants committed the crime of forced labor starting in 2000, it charges the 2000 version of the forced labor statute.  Accordingly, to find the defendants guilty under this version of the statute, the government must prove: (1) that the defendants provided or obtained the labor or services of D.D., (2) that the defendants did so by: (1) threats of serious harm; (b) means of a scheme, plan, or pattern intended to cause D.D. to believe that, if D.D. did not perform such labor or services, D.D. would suffer serious harm; or (c) means of the abuse or threatened abuse of law or legal process; and (3) that the defendants acted knowingly.  Further, because the forced labor statute did not go into effect until October 28, 2000, the government must show that the crime of forced labor continued after the enactment date.  Like conspiracy, forced labor is a continuing offense because "it involves ongoing perpetration, which produces an ongoing threat of harm."  *See United States v. Tavarez-Levario*, 788 F.3d 433, 439 (5th Cir. 2015).

### a.  First Element: Providing or Obtaining Service

The government must first prove that the defendants, either as principals or aiders and abettors, provided or obtained the services of D.D.  The words "provide" and "obtain," which are readily understandable and used in many criminal statutes, have their ordinary meaning.  *Smith v. United States*, 508 U.S. 223, 228 (1993) ("When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning".)

"Provide" means to supply something or make something available. *Merriam-Webster's Collegiate Dictionary* (11th ed. 2014). "Obtain" means to gain or attain, usually by planned action or effort. *Id.*

### b.  Second Element: Prohibited Means of Obtaining Labor

The government must also prove that the defendants used at least one of the prohibited means to obtain D.D.'s labor. Any of the prohibited means charged is sufficient to satisfy the second element of Section 1589.

In enacting Section 1589 as part of the Trafficking Victims Protection Act of 2000 ("TVPA"), Congress intentionally drafted the statutory language broadly to reach the "increasingly subtle methods" used to coerce individuals in continued service or labor, including threats of non-physical types of harm.[3] Thus, the notion of "serious harm" under Section 1589 encompasses "a broad array of harms…both physical and nonphysical," including "not only physical violence, but also more subtle psychological methods of

---

[3] *See* 22 U.S.C. § 7101 (b)(7) (TVPA legislative finding that "traffickers often make representations to their victims that physical harm may occur to them or others should the victim escape or attempt to escape. Such representations can have the same coercive effects on victims as direct threats to inflict such harm"); § 7101(b)(13) (TVPA legislative purpose of criminalizing "servitude through nonviolent coercion," which has the same "purpose and effect" as physical or legal coercion); H.R. Conf. Rep. No. 106-939 (2000), 2000 WL 1479163, at *100-01 (Oct. 5, 2000) (TVPA legislative history stating that "Section 1589 is intended to address the increasingly subtle methods of traffickers who place their victims in modem-day slavery, such as where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence.... [F]ederal prosecutors will not have to demonstrate physical harm or threats of force against victims"); *see also United States v. Garcia*, 2003 WL 22956917, at *4 (W.D.N.Y. 2003) (quoting TVPA legislative history and noting Section 1589's prohibition against "subtle means designed to cause ... victims to believe that serious harm will result to themselves or others if they leave," and against use of "a scheme, plan or pattern...intentionally causing the victim to believe that her family will face harms such as banishment, starvation, or bankruptcy in their home country") (internal quotations omitted).

12

coercion" and threats of inflicting dire consequences "by means other than overt violence." *United States v. Bradley*, 390 F.3d 145, 150 (1st Cir. 2004) (quoting H.R. Conf. Rep. No. 106-939 at *100-01 (2000) and upholding forced labor conviction under Section 1589), vacated on *Booker* grounds, 543 U.S. 220 (2005); *United States v. Calimlim*, 538 F.3d 706, 712 (7th Cir. 2008) (emphasizing that Section 1589 covers nonviolent coercion.)

Section 1589 encompasses any "scheme, plan, or pattern" intended to cause a person to believe that serious harm, either to the victim or "another person," would result if the person, in this instance D.D., did not continue to provide her labor and services.  The words "scheme," "plan," and "pattern" are to be given their ordinary meanings.  *Smith*, 508 U.S. at 228.  A "scheme, plan, or pattern intended to cause the victim to believe that nonperformance of labor or services will result in serious harm" need not involve actual threats of serious harm, but may involve any other means—including deception or psychological coercion— used to cause the alleged victim to believe that she, her family, or any other person would suffer serious harm if she refused to continue providing labor or services.  H.R. Conf. Rep. No. 106-939 (2000), 2000 WL 1479163, at *101 (Oct. 5, 2000); 22 U.S.C. § 710l(b) (congressional findings and purposes relating to enactment of Section 1589).

### i.  <u>Statutory Interpretation and Case Law</u>

A significant body of case law guides the analysis as to whether a person's labor was obtained through prohibited means within the meaning of the second element of Section 1589.  Because Section 1589 was enacted to expand upon the involuntary servitude statute

set forth in 18 U.S.C. § 1584,[4] interpretation of Section 1589 is properly guided by case law interpreting Section 1584. *See Bradley*, 390 F.3d at 153 (construing Section 1589 in light of cases interpreting Section 1584 and upholding forced labor conviction) (citing *United States v. Kozminski,* 487 U.S. 931, 951-52 (1988), and *United States v. Alzanki,* 54 F.3d 994, 1000-01 (1st Cir. 1995)).  Although Section 1589, enacted in 2000, includes more methods for coercing labor than Section 1584, the plain language of Section 1589, coupled with the legislative history, makes it clear that the same principles of law apply to both statutes in determining whether the prohibited means of coercion were sufficient to compel the victim to remain in the defendants' service.

### ii.  Evidence of the Victim's Special Vulnerabilities

In determining whether the defendants' scheme coerced D.D. to perform labor or services, the relevant inquiry is not whether their conduct would have been sufficient to intimidate or coerce an average, educated, English-speaking American to remain in the defendants' service.  Rather, courts have recognized, the proper analysis is whether the defendants' conduct would cause a reasonable person in the victim's situation to believe he or she must remain in the defendants' service to avoid serious harm.

Accordingly, D.D.'s "special vulnerabilities" are relevant, including her background,

---

[4] *See* 22 U.S.C. § 7101(b)(13) (TVPA legislative findings noting intent to expand proscribed means of coercion beyond those proscribed under Section 1584 as interpreted in *United States v. Kozminski*, 487 U.S. 931, 951-52 (1988)); H.R. Conf. Rep. No. 106-939 at *100-01 (2000), 2000 WL 1479163 (Oct. 5, 2000) (TVPA legislative history responding to *Kozminski*); *see also Bradley*, 390 F.3d at 150 (noting that Section 1589 was "intended expressly to counter" *Kozminski*'s interpretation of involuntary servitude as encompassing only physical or legal coercion).

experience, socioeconomic status, and inequalities vis-à-vis the defendants.  H.R. Conf. Rep. No. 106-939 (2000), 2000 WL 1479163, at* 101 (Oct. 5, 2000) ("Section 1589's terms and provisions are intended to be construed with respect to the individual circumstances of victims that are relevant in determining whether a particular type or certain degree of harm or coercion is sufficient to maintain or obtain the victim's labor or services, including the age and background of the victims."); *United States v. Sung Bum Chang*, 237 F. App'x 985, 988 (5th Cir. 2007) (upholding vulnerable-victim sentencing enhancement for a forced labor conviction where victim came from an especially impoverished background, spoke limited English, and was in the country illegally, thus making her particularly susceptible to defendant's fraud and coercion); *Bradley*, 390 F.3d at 152, 153 (upholding jury instruction in Section 1589 prosecution that the "special vulnerabilities" of the victim may be considered in determining if a victim felt compelled to work as "... not all persons are of the same courage or firmness ... " and factors which may be considered are: victim's background, physical and mental condition, experience, education, socioeconomic status, and inequalities between victim and defendant including their relative stations in life); *United States v. Djoumessi*, 538 F.3d 547, 552-53 (6th Cir. 2008) (construing 18 U.S.C. § 1584 and discussing the victim's "special vulnerabilities," including her age, status as an illegal alien, lack of contact with anyone other than the defendant).

As the Supreme Court has explained, "vulnerabilities of the victim are relevant in determining whether the physical or legal coercion or threats thereof could plausibly have compelled the victim to serve."  *See Kozminski*, 487 U.S. at 948 (interpreting Section 1584); *Alzanki*, 54 F.3d at 1000-01 (under Section 1584, "the requisite compulsion obtains when an

individual, through an actual or threatened use of physical or legal coercion, intentionally causes the oppressed person reasonably to believe, given her 'special vulnerabilities,' that she has no alternative but to remain in involuntary service for a time"), *id.* at 1001-02 (holding that jury instruction directing consideration of the victim's background or experience accurately captured Section 1584's objective reasonableness requirement); *United States v. Veerapol*, 312 F.3d 1128, 1132 (9th Cir. 2002) (holding that vulnerable victim sentencing enhancement was proper where the defendants exploited the victim's vulnerabilities due to her illegal status and lack of education); *United States v. Nnaji*, 447 F. App'x 558, 560 (5th Cir. 2011) (upholding forced labor conviction where defendants conspired to isolate and psychologically compel domestic worker to labor for free); *United States v. Dann*, 652 F.3d 1160, 1172 (9th Cir. 2011) (finding that while defendant never explicitly threatened deportation, "she did repeatedly threaten to send [the victim] back to Peru.  That threat alone – to be forced to leave the country – could constitute serious harm to an immigrant").

### iii.  <u>Climate of Fear</u>

In considering whether the defendants' conduct was sufficient to compel the victim's continued service, the courts have held that the relevant analysis is not whether the defendant exacted particular labor tasks through specific threats or specific acts, but rather whether the totality of the defendants' conduct created a climate of fear that compelled the victim's service. *See United States v. Farrell*, 563 F.3d 364, 373 (8th Cir. 2009) (analyzing whether defendants' threatening conduct "actually compelled the victims to serve" in light of the evidence of "the workers' living and working conditions, as well as their particular vulnerabilities"); *Kozminski*, 487 U.S. at 953 (one method of establishing "physical or legal coercion" is through the nefarious practice of creating a climate of fear among the victims); *United States v. Booker*, 655 F.2d 562,

566 (4th Cir. 1981) (upholding defendants' conviction under Section 1584, finding that the record "readily establishes the climate of fear pervading" the agricultural labor camp); *United States v. Harris*, 701 F.2d 1095, 1100 (4th Cir. 1983) (upholding defendant's conviction under Section 1584 based on climate of fear); *United States v. Alzanki*, 54 F.3d 994, 999, 1004-05 (1st Cir. 1995) (finding that depriving victim of food and medical care, while simultaneously threatening violence or deportation, contributed to the climate of fear that compelled victim into involuntary servitude); *United States v. Bibbs*, 564 F.2d 1165, 1168 (5th Cir. 1977) (finding that "[a] defendant is guilty of holding a person to involuntary servitude if the defendant has placed him in such fear of physical harm that the victim is afraid to leave, regardless of the victim's opportunities for escape").

### iv.   No Affirmative Duty to Escape

The law interpreting both Section 1584 and Section 1589 is clear that a victim is under no affirmative duty to attempt to escape if the defendants have placed her in fear of doing so.  Thus, the fact that D.D. may have had opportunities to escape is not determinative if the defendants, using one or more of the prohibited means discussed earlier, made D.D. reasonably believe that she could not leave or that she would suffer serious harm if she did so.

As the *Bradley* court affirmed in upholding jury instructions applying Section 1589, "the government need not prove physical restraint, such as the use of chains, barbed wire, or locked doors to establish offense of forced labor;" and the fact that the victim "may have had the opportunity to flee is not determinative of ...  forced labor if ...  the defendant placed [the victim] in such fear or circumstances" the she did not believe she could leave.  *Bradley*, 390 F.3d 145,153 (quoting and affirming jury instructions); *see also Djoumessi*, 538 F.3d at  552 ("Also unavailing is [defendant's] contention that [victim] necessarily remained voluntarily at his home because he never physically restrained her ... and she never attempted to escape.  But opportunities

17

for escape mean nothing if [defendant] gave her reasons to fear leaving the house –as indeed he did"); *United States v. Warren,* 772 F.2d 827, 834 (11th Cir. 1985) ("That the worker had the opportunity to escape is of no moment, if the defendant has placed him in such fear ... that he is afraid to leave."); *Booker*, 655 F.2d at 567 (holding that trial court "should not have charged the jury that it would have to find that the defendants' use of force effectively denied the possibility of escape to the victims. The availability of escape ... or even a situation where the discipline of terror is not constantly enforced, does not preclude a finding that persons are held as slaves."); *Alzanki*, 54 F.3d at 1000 ("The government need not prove physical restraint"); *United States v. Bibbs*, 564 F.2d at 1168 ("[A] defendant is guilty of holding a person to involuntary servitude if the defendant has placed him in such fear of physical harm that the victim is afraid to leave, regardless of the victim's opportunities for escape.").

### c.   **Third Element: The Defendants Acted "Knowingly"**

The third and final element of the forced labor charge requires the government to prove that the defendants acted "knowingly."  "Knowingly" simply means that an "act was done voluntarily and intentionally, not because of mistake or accident."  *United States v. Aggrawal*, 17 F.3d 737, 744 (5th Cir. 1994) (holding that the jury instructions provided correct definition of the term); *see* Fifth Circuit Pattern Jury Instructions No. 1.37 (2015).

### d.   **Defendants Acted in Agreement, and Aided and Abetted one Another**

The defendants are also charged with aiding and abetting the commission of Section 1589. Under 18 U.S.C. § 2, an aider or abettor of an offense against the United States is "punishable as a principal."  To convict the defendants on an aider or abettor theory, the government must prove that (1) someone committed the charged crime; (2) the defendant knowingly and intentionally

18

aided, counseled, commanded, induced, or procured that person to commit each element of the crime; and (3) the defendant acted before the crime was completed. *United States v. Turner*, 674 F.3d 420 (5th Cir. 2012).

**B.** **Counts Three and Four – Conspiracy to Harbor an Alien for Financial Gain and Harboring an Alien for Financial Gain,  8 U.S.C. §§ 1324(a)(1)(A)(v)(I), 1324(a)(1)(A)(iii), and 1324(a)(1)(B)(i)**

**1.** **Count Three – Conspiracy to Harbor an Alien for Financial Gain, 8 U.S.C. §§ 1324(a)(1)(A)(v)(I) and 1324(a)(1)(B)(i)**

Count Three charges the defendants with conspiracy to harbor an alien for financial gain in violation of 8 U.S.C. §§ 1324(a)(1)(A)(v)(I), and 1324(a)(1)(B)(i).

To prove an alien harboring conspiracy in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I), the government must prove the following elements: (1) that the defendant and at least one other person made an agreement to commit the crime of harboring an alien for financial gain as charged in the Indictment; and (2) that the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with intent to further the unlawful purpose.

The relevant law to establish a conspiracy for this count is the same as that discussed in Count One.

**2.** **Count Four—Harboring an Alien for Financial Gain, 8 U.S.C. §§ 1324(a)(1)(A)(iii), 1324(a)(1)(A)(v)(II), and 1324(a)(1)(B)(i)**

Count Four charges the defendants with harboring an alien for financial gain in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii), 1324(a)(1)(A)(v)(II), and 1324(a)(1)(B)(i).

To prove alien harboring in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii), 1324(a)(1)(A)(v)(II), and 1324(a)(1)(B)(i) in the Fifth Circuit, the government must prove the following elements: (1) that D.D. was an alien who entered, came to, or remained in the United

19

States in violation of law; (2) that the defendant concealed, harbored, or sheltered from detection D.D. within the United States; (3) that the defendants knew or acted in reckless disregard of that fact that D.D. entered, came to, or remained in the United States in violation of law; (4) that the defendants' conduct tended to substantially facilitate D.D. entering, coming to, or remaining in the United States illegally and (5) that the defendants did so for private financial gain.  *See* 8 U.S.C. §§ 1324(a)(1)(A)(iii), 1324(a)(1)(A)(v)(II), and 1324(a)(1)(B)(i); *see also United States v. Jimenez-Elvierz*, 862 F.3d 527, 533-34 (5th Cir. 2017).

As with Count Two, the defendants are charged with aiding and abetting each other in the commission of alien harboring for financial gain.

### a.  <u>First Element: Alien in Violation of Law</u>

The Fifth Circuit held that entering, coming, or remaining in the United States in violation satisfy this element of the offense.  *United States v. Esparza*, 882 F.2d 143, 145-146(5th Cir. 1989); *see also United States v. Morales–Rosales,* 838 F.2d 1359, 1361 (5th Cir.1988).  Overstaying a tourist visa qualifies as remaining in the United States illegally.

### b.  <u>Second Element: Harbor</u>

The courts of appeal differ as to whether "harbor" simply means to shelter, *see e.g., Dann*, 652 F.3d at 1172, or whether it requires more active concealment or shielding from detection, so as to "substantially facilitate the alien remaining in the United States illegally."  *United States v. Vargas-Cordon*, 733 F.3d 366, 382 (2d Cir. 2013).  The Fifth Circuit has found the term "harbor" to mean something more than merely providing shelter, but has expressed this requirement as an additional fourth element – *i.e.*, "the defendant's conduct tended to substantially facilitate the alien

remaining in the United States illegally." *United States v. Rubio-Gonzalez*, 674 F.2d 1067, 1073 (5th Cir. 1982); *United States v. Shum*, 496 F.3d 390, 392 (5th Cir. 2007).  As a result, the terms "concealing," "harboring," and "sheltering" should be given their ordinary meaning.

### c.  Third Element: Recklessly Disregard

Regarding the third element, whether the defendants knew or recklessly disregarded D.D.'s illegal status, "[c]ircumstantial evidence alone can establish a defendant's knowledge or reckless disregard that the people harbored are illegally in the country."  *De Jesus-Batres*, 410 F.3d 154, 161 (5th Cir. 2005) (citing *Rubio-Gonzalez*, 674 F.2d at 1071).

### d.  Fourth Element: Substantially Facilitate

As to the fourth element, the Fifth Circuit has defined "substantially facilitate" to mean any conduct that makes "an alien's illegal presence in the United States substantially 'easier or less difficult.'"  *Shum*, 496 F.3d at 392 (quoting *United States v. Dixon*, 132 F.3d 192, 200 (5th Cir. 1997)).  Cases from the Fifth Circuit have held that taking steps to employ an illegal alien constitutes "substantially facilitating" the alien's ability to remain in the United States.  The evidence will demonstrate that the defendants facilitated D.D, remaining in the United States by making her completely isolated and unable to interact with the outside world.  D.D.'s sequestration, combined with her lack of possession of her passport and visa, effectively hid her from the outside world and made her detection from authorities less likely.  *See, e.g., Dann*, 652 F.3d at 1174 (finding that defendant restricted victim's movement "and forbade her from speaking to anyone outside the home" was sufficient evidence that the defendant was shielding the victim from detection); *United States v. Campbell*, 770 F.3d 556, 570 (7th Cir. 2014) (finding that defendant's efforts to profit from victims' labor "could be successful only if he were able to prevent law enforcement from detecting their illegal status and deporting them").

### d. Fifth Element: Financial Gain

Finally, the evidence will demonstrate that the defendants were motivated by private financial gain.  The Fifth Circuit recently clarified the definition of financial gain.  *See United States v. Garcia,* 883 F.3d 570 (5th Cir. 2018).  The Court explained that financial gain requires evidence that the defendants had the "goal of improving [their] economic status in one way or another."  *Id*.; *see United States v. Zheng,* 306 F.3d 1080, 1085 (11th Cir. 2002).  Courts have held that financial gain can be inferred from financial purpose from certain circumstantial evidence and prospective gain.  *See United States v. Li*, 615 F.3d 752, 756 (7th Cir. 2010) (holding that employer did not pay undocumented worker state mandated minimum wage shows financial gain to the employer).  Additionally, Courts have found that sufficient evidence of financial gain where defendants harbored an undocumented alien and the alien's "labor came at a significantly lower price than a comparable American housekeeper."  *Calimlim*, 538 F.3d at 715.

Harboring an alien is a lesser included offense of harboring an alien for financial gain. The fifth element above is the only additional element to the crime of harboring an alien for financial gain.  Aiding and abetting the harboring of an alien is a lesser included offense of harboring an alien.  *United States v. Williams*, 449 F.3d 635, 646-48 (5th Cir. 2006).

### C.   Count Five – False Statement, 18 U.S.C. § 1001(a)(2))

Section 1001(a)(2) makes it a crime for a person, "in any matter within the jurisdiction of the executive . . . branch of the Government of the United States, [to] knowingly and willfully… make [] any materially false, fictitious, or fraudulent statement or representation."  18 U.S.C. § 1001(a).  To establish a Section 1001 violation, the government must prove that the defendant: (1) made a false statement to the Diplomatic Security Service regarding a matter within its jurisdiction; (2) that the defendant made the statement intentionally, knowing that it was false; (3) that the

22

statement was material; (4) that the defendant made the false statement for the purpose of misleading the Diplomatic Security Service.  *United States v. Jara-Favela*, 686 F.3d 289, 301 (5th Cir. 2012) *citing United States v. Hoover,* 467 F.3d 496, 499 (5th Cir. 2006); *see also* Fifth Circuit Pattern Jury Instructions Nos. 245 (2015).  The "statements [must] be 'material' to the Government inquiry, and that 'materiality' is an element of the offense that the Government must prove." *United States v. Gaudin*, 515 U.S. 506, 509 (1995); *see also United States v. Najera Jimenez*, 593 F.3d 391, 399 (5th Cir. 2010).

### D. *Bruton* **Issue**

As discussed previously, defendant Toure's post-arrest statements provide incriminating evidence against him, especially with respect to the alien harboring charges.  In making those statements, Toure alternates between "I" and "we" referring to him and his co-defendant wife, defendant Cros-Toure.  The statements create a *Bruton* issue, but one defendant Cros-Toure is entitled to waive through a knowingly and voluntary waiver on the record.

In *Bruton v. United States*, 391 U.S. 123 (1968), the Supreme Court held that a defendant is deprived of her Sixth Amendment right to confrontation when a facially incriminating statement of a nontestifying co-defendant is introduced at the joint trial, even where the jury is instructed to consider the statement only against the co-defendant.  *Id.* at 136-37.  In *Richardson v. Marsh*, 481 U.S. 200 (1987), however, the Court subsequently made clear that *Bruton's* rule was a narrow one, explaining that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence."  *Id.* at 211.  The fact that the statement became incriminating "only when linked with

23

evidence introduced later at trial," the Court found, did not result in a Confrontation Clause violation. *Id*. at 208-09.

The defendant, however, may waive her right to make a *Bruton* objection. The Fifth Circuit has held that waiver of *Bruton* "is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" *United States v. Reveles*, 190 F.3d 678, 683 (5th Cir. 1999) (citing *Olano*, 507 U.S. at 733 (citation omitted), *abrogated on other grounds by United States v. Vargas-Ocampo*, 747 F.3d 299 (5th Cir. 2014). Because the defendant in that case explicitly waived his Sixth Amendment confrontation right at trial, the Court held that he could not successfully claim that the district court erred by failing to protect that right. *Id*. The Fifth Circuit recently affirmed these principles in *United States v. Ceballos*, 789 F.3d 607, 613 (5th Cir. 2015) (holding that where a defendant did not object to admission of her co-conspirator's testimony at trial, she had waived her Sixth Amendment right of appeal making her claim unreviewable).

## IV.    CONCLUSION

The United States respectfully submits the foregoing Trial Brief in preparation for the scheduled trial in the above-captioned matter.

Respectfully submitted,

*/s/ Rebekah J. Bailey*
REBEKAH J. BAILEY
Trial Attorney
U.S. Department of Justice, Civil Rights Division
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530
State Bar of Texas, Bar Card No. 24079833

24

*/s/ William E. Nolan*
WILLIAM E. NOLAN
Trial Attorney
U.S. Department of Justice, Civil Rights Division
950 Pennsylvania Ave., N.W.
Washington, D.C. 20530
State Bar of Maryland, Bar Card No. 0012130143


*/s/ Alex C. Lewis*
ALEX C. LEWIS
Assistant United States Attorney
Missouri State Bar No. 47910
801 Cherry Street, Suite 1700
Fort Worth, Texas 76102
Telephone:    817-252-5200
Facsimile:     817-252-5455


### CERTIFICATICATE OF SERVICE

I hereby certify that on December 31, 2018, I electronically filed the foregoing document with the clerk for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  The electronic case filing system sent a ANotice of Electronic Filing@ to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means: Brady Wyatt, David Finn and Scott Palmer.


*/s/ Rebekah J. Bailey*
REBEKAH J. BAILEY
Trial Attorney


25